Argued January 3; affirmed February 19; reahearing denied
March 19, 1946

# In re WITHERILL'S ESTATE
# BENNETT *v.* WHITLOCK
### (166 P. (2d) 129)

Before ROSSMAN, Acting Chief Justice, and KELLY, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*A. C. Yaden,* of Klamath Falls, for appellant.

*Richard B. Maxwell,* of Klamath Falls (Farrens & Maxwell, of Klamath Falls, on the brief), for respondent.

BAILEY, J. This is an appeal by Charles Bennett from the order of the circuit court denying his petition for the removal of Earl Whitlock, as administrator of the estate of Harry Albert Witherill, deceased.

Harry Albert Witherill died intestate on July 4, 1939, leaving surviving him as his only heirs two sisters and two brothers, all residents of the state of California. Mrs. Mary Douglass, upon hearing of her brother's death, came to Klamath Falls on July 5th and made arrangements for the funeral with the Earl Whitlock Funeral Home in that city. Later, and on December 10, 1939, she requested, and procured, the appointment of Earl Whitlock, proprietor of the funeral home bearing his name, as administrator of her deceased brother's estate.

At the time of his death, Mr. Witherill was 73 years of age and was living near Klamath Falls, Oregon, on a small dry ranch, which he owned. His nephew, Wade Hampton, who helped him operate the farm, lived with him. Hampton, because of an alleged understanding with the decedent, claimed an interest in the livestock

on the place. He also claimed that he was the owner of other personal property on the ranch.

Before returning to her home, Mrs. Douglass, with the assistance of Wade Hampton, gave the administrator a list of the personal property which the decedent owned or in which he had an interest. This property and the decedent's real property, a description of which was furnished the administrator by the abstract companies in Klamath Falls, were included by him in the inventory of the estate. The real property was appraised at $1,200; the livestock, without regard to Hampton's asserted interest, at $545; the machinery and farm equipment at $100.50; the unpaid balance of the sale price of a tract of land, at $600, and the unpaid balance on a note at $35.00, aggregating $2,480.50. The inventory was sworn to by the administrator on July 10, 1939, but was not filed until November 17 of that year.

The livestock, farm machinery, and the 1939 grain crop had been mortgaged by the decedent and Wade Hampton to the United States Farm Security Administration. A small crop was grown in the year 1939, and the proceeds realized from the sale thereof, amounting to $126.18, were applied on the mortgage indebtedness. On November 29, 1939, an order was entered authorizing the administrator to sell the personal property. He attempted to sell the livestock but was unable to find a purchaser. Feed was scarce, and neither Hampton nor the administrator had funds with which to buy a sufficient supply for the winter. On the advice of his attorney, the administrator decided to and did transfer the mortgaged livestock and farm machinery to the Farm Security Administration in satisfaction of the indebtedness owing it. Both Hampton and the ad-

ministrator joined in the transfer, which was made in the latter part of December, 1939.

In December, 1939, the administrator obtained an order of court for the sale of the real property. The petition for the sale inadvertently failed to include a 40-acre tract. Notice of sale of the real property included in the petition was not published until August 5, 1941. In the interval between the order authorizing the sale of the real property and the publication of the notice of sale, the administrator attempted to secure a purchaser for the property but was unsuccessful. On the 28th day of February, 1940, he leased the real property, with the exception of the 40 acres above mentioned, to Roy Huff for the period beginning March 1, 1940, and ending on December 1 of that year. The rental was one quarter of all hay and grain grown on the ranch. All the real property was leased to Francis Flowers for the period beginning March 1, 1941, and expiring on December 1, 1941, at the same rental specified in the lease to Huff. The Flowers's lease was extended from March 1, 1942, to December 1 of that year.

The administrator, in January, 1942, sold six lots in Midland, a platted portion of Klamath county, for $50.00. On January 28, 1943, he entered into a written contract with Roy Huff and Gertrude Huff, his wife, for the sale of all the remaining real estate of the decedent, with the exception of the 40-acre tract, for the sum of $800, subject to the approval of the court. This contract further provided that when authorization was procured to sell the 40-acre tract, the Huffs would submit a bid therefor of not less than $400. At the time this contract was entered into it was orally agreed between the administrator and the Huffs that the Huffs should have immediate possession of the property, and,

in the event the property was not sold to them, they should pay the same rental for the year 1943 as that specified in the 1940 lease. An order authorizing the sale of this 40-acre tract of land was made and entered on the 4th day of March, 1943, and thereupon the Huffs submitted a bid of $400 for the tract.

Mr. Bennett, in the early part of February, 1943, heard that the Witherill estate ranch was for sale. He made inquiry of the administrator about the property and was told that it had already been sold to Mr. Huff, and was advised by the administrator to "go down and see" Huff about the property. Huff informed Bennett that he did not know whether he had bought the property or not, but that he had "paid money down but I do not know; see Whitlock."

In April, 1943, the administrator filed a petition in which he set forth that the real property had been sold to Mr. and Mrs. Huff for $1,200 and requested an order approving and confirming the sale. A few days later Bennett filed his objections to the confirmation of sale and offered to pay $1,440 for the property. In reporting that higher offer to the court, the administrator requested "an order vacating the Huff sale and directing a re-sale of the premises." Such an order was entered on the 30th day of April, 1943.

Due to the drought, poor crops were grown on the Witherill ranch in 1939, 1940, 1941, and 1942. In 1943 there was a greater demand for farm land than there had been for several years.

Some time in May, 1943, Bennett purchased from two of the heirs an undivided one-half interest in the land, and later in July purchased from the two remaining heirs their interest therein. The deeds of conveyance recited that the grantors "hereby remise, release

and forever quitclaim unto the said Charles Bennett and unto his heirs and assigns all our right, title and interest in and to the following described parcel of real estate," setting forth the description of the real property. In July, 1943, all the heirs executed and delivered to Bennett an instrument which purported to remise, release and quitclaim to him all of their right, title and interest in "all of the real and personal property of the Harry Albert Witherill Estate of whatsoever sort or description and including the real property heretofore described and conveyed" to Bennett by the quitclaim deeds hereinbefore mentioned. The instrument last mentioned further provided that "the administrator of said estate is hereby directed and authorized to deliver and pay over to said Bennett all assets of said estate remaining upon the settlement of the final account in said estate. Said Bennett agrees to pay any remaining indebtedness of said estate in consideration of this assignment and quitclaim." Bennett paid the heirs approximately $380 for the transfer of their interest in the estate.

Bennett, upon receiving the documents hereinbefore referred to, demanded possession of the real property. He was permitted to occupy the house on the premises, but was denied possession of the remainder.

A petition was filed on August 28, 1943, by Mr. Bennett charging the administrator with wilful neglect and mismanagement of the estate and unfaithfulness and neglect in the discharge of his trust and requesting his removal. The specific acts of negligence and mismanagement of which the administrator is accused will be referred to hereinafter in detail. To this petition the administrator filed his answer denying the charges against him. At the same time he filed in the probate

court his account in which he set forth a detailed statement of his receipts and disbursements and an itemized list of the debts against the estate. According to this report he had received $1,379.20 and had expended $628.13, leaving a balance on hand of $751.07. The unpaid claims, including the administrator's and attorneys' fees, amounted to $961.80, leaving a deficiency of $210.73.

Section 19-222, O. C. L. A., insofar as material here, reads as follows:

"Any heir, legatee, devisee, creditor, or other person interested in the estate may apply for the removal of an executor or administrator who has * * * in any way, been unfaithful to or neglected his trust, to the probable loss of the applicant. Such application shall be by petition, and upon notice to the executor or administrator, and if the court find the charge to be true, it shall make an order removing such executor or administrator, and revoke his letters."

██ The title of all realty upon the death of the owner passes to his heirs, in the event he dies intestate, subject only to the right of the administrator to the possession thereof for the payment of debts. *Blake v. Blake,* 147 Or. 43, 31 P. (2d) 768; §§ 19-301 and 19-1202, O. C. L. A. A vested equitable right in personal property is acquired by the heirs immediately on the death of the intestate. Their interest therein, however, is uncertain and contingent until it is ascertained that a surplus remains after the debts and expenses of administration are paid. *In re McLeod's Estate,* 159 Or. 687, 82 P. (2d) 884.

█ The quitclaim deed from the heirs to Bennett conveyed to him only the right, title, and interest which the grantors had at the time of executing the deeds,

and nothing more. 16 Am. Jur., Deeds, § 331, p. 625; 18 C. J., Deeds, § 32, p. 156. Bennett did not, by these deeds, acquire any right to damages for trespass or other injury to the real property previous to the conveyances. 16 Am. Jur., Deeds, § 297, p. 607; 18 C. J., Deeds, § 276, p. 296; *Ft. Lyon Canal Co. v. Bennett,* 61 Colo. 111, 156 P. 604; *Moore v. City of Lancaster,* 212 Pa. 642, 62 A. 100, 2 L. R. A. (N. S.) 819; *Irvine v. City of Oelweim,* 170 Iowa 653, 150 N. W. 674, L. R. A. 1916 E, 990.

■ Before Bennett acquired any interest in the realty, the administrator had sold the water tank and milk shed located thereon for $32.50. These buildings were a part of the real property, and, by permitting them to be removed therefrom, the value of the real estate, according to Bennett, was greatly depreciated. Whether the administrator committed any wrong in selling these buildings, no "probable loss" to Bennett resulted by reason thereof. Bennett acquired only whatever interest the heirs had in the realty at the time of his purchase. No claim for injury to the property was assigned to him. Undoubtedly the price which Bennett paid for the ranch was influenced to a large extent by the condition in which he found it at the time of its purchase.

■■ The inventory and appraisement filed in the estate contains the oaths of all three appraisers. It is now contended by Bennett that only one of the appraisers took the oath. This contention is based upon the testimony of Mr. Huff, who stated that he did not "think" that he nor Mr. Frost had appeared before a notary public. This evidence is not convincing and is insufficient to impeach the certificate of the notary public. 46 C. J., Notaries, § 32, p. 519. The inventory

and appraisement was not filed until November 17, 1939, but this delay was not due to the neglect of the administrator but to that of the appraisers. Moreover, Bennett was in no wise prejudiced by this delay.

■ On the 5th day of July, 1939, five days before Whitlock was appointed administrator, Mrs. Douglas withdrew from the Klamath Falls Branch of the First National Bank of Portland the sum of $79.55. In order to procure this money she signed an affidavit to the effect that she was the sole heir of the decedent. Before Mrs. Douglass returned home she paid Whitlock the sum of $39.50 on account of funeral expenses. Immediately upon his appointment as administrator, Mr. Whitlock inquired of all the banks in Klamath Falls to ascertain whether the decedent had any money on deposit and was told that he had none. He did not learn of the withdrawal of this money by Mrs. Douglass until the time of the trial. One of the charges of neglect against the administrator is his failure to recover from Mrs. Douglass the difference between the amount she withdrew from the bank and what was paid on account of funeral expenses. When Mrs. Douglass failed to pay this $40.05 to the administrator, her distributive share of the estate was reduced *pro tanto*. Mr. Bennett, as assignee of her interest, is in no better position than she would have occupied had the assignment not been made. *Boise Payette Lumber Co. v. National Surety Corporation,* 167 Or. 553, 118 P. (2d) 1066.

■ Proof is lacking that the administrator did not act for the best interests of the estate when he and Hampton transferred the livestock and machinery to the Farm Security Administration in satisfaction of the mortgage indebtedness. This transfer was made by the administrator on the advice of his attorney and after

he had been unsuccessful in finding a purchaser for the machinery and livestock. If the livestock had not been disposed of, it would have been necessary for the administrator to continue to employ someone to care for them. The amount of indebtedness to the Farm Security Administration was less than the appraised value of the livestock and machinery, but it must be remembered that the livestock were appraised without taking into consideration Hampton's asserted claim to a one-half interest in the stock. Mr. Frost, a witness called by Bennett, testified that one yearling and a couple of pigs died of starvation. This occurred, he stated, "in the forepart of 1940," which was after the transfer but before the livestock had been removed from the ranch.

After Bennett acquired the interest of the heirs in the real estate, he requested that the administrator dispossess Huff, the tenant, asserting that the administrator was without authority to lease the property after procuring an order for the sale thereof. When Whitlock became administrator the debts of the estate were in excess of the value of the personal property. There was no market for the real property, and he therefore leased it. The income to the estate from the ranch for the years 1940, 1941, and 1942, was approximately $236.50; for the year 1943, it was $261.47, and it was paid to the administrator before September 16 of that year.

In addition to the payment of rental, the tenants agreed at their own expense to "keep and maintain the fences, buildings and other improvements upon said premises in such state of repair as to be usable and tenantable" and "to obey all laws and regulations

governing the control and destruction of noxious weeds and rodents on said premises."

Section 19-301, O. C. L. A., provides in part as follows:

"The executor or administrator is entitled to the possession and control of the property of the deceased, both real and personal, and to receive the rents and profits thereof until the administration is completed, or the same is surrendered to the heirs or devisees by order of the court or judge thereof; * * * "

Under this provision of the code, the administrator is granted authority to lease the realty. *Boyer v. Anduiza*, 90 Or. 163, 175 P. 853. A formal written lease of real property for one year is not required. §§ 2-905 and 2-909, subd. 6. The lease of the ranch to Huff for the crop year 1943 was therefore not invalid because it was not in writing. In December, 1939, the administrator procured an order of court authorizing him to sell the real property of the estate. Such order, however, did not preclude him from thereafter leasing the property if it did not interfere with the sale thereof or the closing of the estate. The lease of the property in 1943 had no such effect and was valid.

The real property described in the inventory consisted of more than 140 lots in Midland Heights and 27 tracts in First Addition to Midland, a platted portion of Klamath county. In 1939, and a short time after Whitlock had been appointed administrator of the estate, two of these lots were sold by the county of Klamath for delinquent taxes. That fact did not become known to the administrator until the trial of this proceeding when Bennett disclosed that he had purchased the property from the county for $20.00. The

administrator knew that the taxes against all the real property were delinquent but he had no funds with which to pay them.

 Mrs. Douglass and Wade Hampton prepared a list of personal property belongings to the estate for the administrator. It is now claimed by Bennett that the administrator was negligent in not including in that inventory certain personal property. He mentions two firearms: a shotgun and a rifle, the value of which he claims was $50.00. These weapons were not on the ranch, and, according to Bennett's witness, Frost, were claimed by Hampton. Then there was an old wrecked automobile which decedent had abandoned, and it was considered worthless by Mrs. Douglass and Hampton. Later, however, Hampton purchased it from the administrator for the sum of $50.00. There was an old mowing machine and rake which were not included in the mortgage to the Farm Security Administration and were considered of no value by Mrs. Douglass and Hampton. Frost was the principal witness to testify concerning these and other articles of personal property which were omitted from the inventory. He was one of the appraisers, but he did not mention the fact to the administrator that they had been omitted, probably because he did not consider them of any value at that time. His testimony as to the condition and the value of such property was indefinite and uncertain. In preparing the inventory, the administrator was guided by the information furnished him by Mrs. Douglass, the sister of the decedent and the representative of the heirs, and by Wade Hampton, his nephew.

We shall not list here all the alleged "items of negligence, carelessness, and wilful mismanagement" set forth in Mr. Bennett's brief for the reason that they

are mentioned there, as he says, "only for the purpose of showing the average work done in the estate by the administrator and to portray his claimed concept of a fair and orderly administration of an estate."

The circuit court, in its findings which were entered as part of its order, stated as follows: "It is evident to the court that the administrator was negligent and careless in his administration of the estate in that he failed to file semi-annual accounts and to file with the court the claims against the estate. It also appears that the administrator failed to include in his inventory and appraisement some of the personal property of the estate, however, this was due to the fact that he relied upon the nephew, W. W. Hampton, and the sister, one of the heirs of decedent, for the inventory, but I feel that the liability of the administrator for these acts should be left to a hearing of the final account. There is no evidence before the court that any of the personal property so omitted is still in existence."

*In re Faulkner's Estate*, 156 Or. 23, 65 P. (2d) 1045, we find the following: "Probate courts are vested with large discretionary power in control of executors and administrators in the administration of estates, and appellate courts should not interfere unless there is a plain abuse of such discretion: (Citing authorities)."

It is doubtful whether the assets of the estate were, at the time of the appointment of the administrator, sufficient to pay the indebtedness and the expenses of administration. At the time the petition for removal of the administrator was served on him, the total indebtedness, including the expenses of administration, exceeded the funds which he had on hand in the amount of only $210.00.

■ After Mr. Bennett made his offer to the administrator of $1,440.00 for the real property and before he had purchased the interests of the heirs therein, Mr. Huff increased his bid for the property to $1,590.00. This offer by Mr. Huff was known to Mr. Bennett at the time he purchased the interests of the heirs in the entire estate for approximately $380.00. Mr. Bennett is the only one petitioning the court for the removal of the administrator. The record does not disclose that the heirs were dissatisfied at any time with the administration of the estate. The failure of the administrator to file his semi-annual reports and the claims against the estate did not result in "the probable loss of the applicant", Bennett. § 19-222, O. C. L. A.

The manner in which this estate has been administered does not meet with the approval of this court in all respects. We do not think, however, that the negligence and carelessness of the administrator were such as to warrant a reversal of the order of the circuit court sitting as a court of probate.

The order appealed from is therefore affirmed.